UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| KEVIN RICHARD HALL, | ) | |
| | ) | |
| Movant | ) | |
| v. | ) | 2:02-cr-00031-DBH-1 |
| | ) | 2:10-cv-00257-DBH |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent | ) | |

**RECOMMENDED DECISION**

Kevin Hall was convicted in 2003 of one federal drug offense, 163 counts of money laundering, and four counts of tax evasion. The jury returned a special verdict finding that all of Hall's interest in certain properties named in the forfeiture counts was subject to forfeiture, including, but not limited to: (1) a mortgage given to the defendant by Felicity Hyde pursuant to a power of attorney, encumbering certain real property located at 380 Belfast Road, Camden, Maine, owned by Phyllis Hyde, recorded in the Knox County Registry of Deeds at Book 2434, Page 233 (the $56,570 mortgage) and (2) all assets of the Fire Island Construction Company, Inc., including a second mortgage on the Belfast property also given to the defendant by Felicity Hyde pursuant to a power of attorney, recorded in the Knox County Registry of Deeds at Book 2435, Page 318 (the $33,053.50 mortgage). On January 31, 2003, this court entered its preliminary order of forfeiture extinguishing all of Hall's right, title, and interest in each of the forfeited assets, including the two mortgages, and transferring the same to the United States. The final order of forfeiture entered on October 1, 2003.

As the First Circuit Court of Appeals summarized in its decision on Hall's first direct

appeal, "The 163 [money laundering] counts essentially involve loans to friends and colleagues and related transactions, purchases of cars and other vehicles, expenditures to renovate property, and establishing a construction business." United States v. Hall, 434 F.3d 42, 50 (1st Cir. 2006) (Hall I).  A consequence of this first direct appeal was that the First Circuit remanded for resentencing in light of United States v. Booker, 543 U.S. 220 (2005).  See Hall I, 434 F.3d at 48-49.  As a result, Hall's sentence was reduced from 151 months to 120 months.  Hall took another direct appeal to no avail.  See United States v. Hall, 557 F.3d 15, 22 (1st Cir. 2009), cert. denied, 557 U.S. 928 (2009) (Hall II).

Now, more than ten years after Hall's criminal conviction, a witness from the January 2003 criminal trial, William M. Ferrell, Jr., has filed in this criminal case what he calls a "motion for review of forfeiture" (ECF No. 272).  According to Ferrell, he currently owns the Belfast property that is subject to the two mortgages and gained title through an intra-family transfer in exchange for his payment of municipal property taxes to avoid foreclosure.  (Reply at 4, ECF No. 274.)  When Kevin Hall was resentenced in 2007, the amended judgment specifically ordered that Hall was to forfeit to the United States "his interest in the property that is the subject of the Court's Final Order of Forfeiture dated 10/01/2003" (ECF No. 189 at 6), which included the previously described Hyde mortgages.

In March 2012, the government settled its account with Kevin Hall and, according to the motion and the response, the government assigned all of its interest in the mortgages back to Hall, releasing any liens it may have had on the property as the result of the final order of forfeiture, evidently in exchange for Hall's payment of certain sums to the United States Treasury.  It now appears that Hall, as assignee of the United States' interest, has reinstituted his state court foreclosure action against Hyde.  Ferrell's motion appears to be a pre-emptive strike

2

seeking to "foreclose" Hall from proceeding in the state court action.

The specific relief which Ferrell seeks from this court is an order declaring that Hall's right in the mortgages was forever extinguished and that the mortgages are null and void. I recommend that the court dismiss Ferrell's motion because there is no legal basis upon which this court can "review" its final order of forfeiture and provide any relief to Ferrell, who is not a party to this criminal action nor a party to the mortgages that were ordered forfeited to the United States.[1]

### FACTUAL BACKGROUND

Ferrell relates that the government called him as a witness in connection with count 160 of the indictment, relating to Hall's modus operandi in regard to loaning drug proceeds to his friends in order to launder the money into reportable forms, such as income from a mortgage. According to Ferrell, the AUSA and the IRS agent assured him that his "willingness to testify as to Count 160, in no way affected the 'mortgages' obtained fraudulently and under duress." (Motion at 1.) Ferrell was told it was unlikely that any of the money would have to be repaid, or "if any, just a token amount." (Id.)[2] According to Ferrell, Hall has a girlfriend who is a lawyer

---

[1]     The United States never attempted to foreclose on the subject property during the time it held the mortgages pursuant to the order of forfeiture. Thus, whatever present interest Ferrell has in the subject real estate, the United States has never proceeded to enforce anything against him as a result of this court's order of forfeiture. The government maintains that between 2003 and February 2012, Felicity Hyde was given multiple opportunities to acquire the mortgages from the United States, but chose not to do so, apparently believing that the mortgages were unenforceable because she had lacked authority to grant them. (Response at 3, ECF No. 273.) Whether the mortgages were lawful is, of course, a state law question to be resolved in the context of the foreclosure litigation.

[2]     In its response, the government explains the following about Ferrell's testimony: "A government witness, William M. Ferrell, Jr., testified that in 1997 and 1998 he smoked marijuana 4-5 times per week (Tr. at 369). He purchased marijuana from George and Brenda Elliot, two cooperating unindicted coconspirators of the defendant, between 3-5 times during this time period and he knew that the Elliots were storing marijuana for the defendant (Tr. at 370). The defendant offered to loan Ferrell some money so the defendant could "legitimize" his drug money (Tr. at 377). Ferrell declined but suggested that his wife, Felicity Hyde, might accept a loan from the defendant if she did not know it was drug money (Tr. at 377-78). The defendant eventually loaned money to Felicity Hyde and delivered a paper bag full of cash totaling $25,000. The defendant later loaned Hyde more money (Tr. at 379). Ferrell further testified that Felicity Hyde wanted to repay the loan in cash because she learned it was drug money, but the defendant told her he would only accept a check. (Tr. at 379-80)." (Gov't Response at 1, ECF No. 273.)

and she is the person who invented the scheme whereby drug money was laundered by creating and recording mortgages and bogus mechanic's liens.

In 2000, Hall engaged the law firm of Lipman & Katz to prosecute foreclosure actions on the two mortgages.  Lipman & Katz claimed legal fees and costs from the foreclosure actions totaling $23,240.99 and attempted to assert that claim in the then-pending criminal forfeiture action.  Adrianne L. Fernstrom, an attorney for Phyllis Hyde, wrote a letter[3] to the clerk of this court on June 13, 2002, informing the clerk of the pending litigation in the Knox County Superior Court between Kevin Hall and Felicity Hyde and Phyllis Hyde.  This submission was provided to the clerk apparently in the context of the then-pending motion Hall filed in this court, which was a motion to modify, clarify, or lift the pre-trial restraining order issued in the criminal case.  According to a notation placed on the correspondence, the documents were submitted to the trial judge to review in the context of the motion to modify because the state foreclosure action was frozen as a result of this court's order of March 27, 2002, which temporarily restrained Hall from disposing of any assets.  On April 30, 2002, Hall's attorneys moved to modify the restraining order ostensibly to allow Hall to proceed with his then-pending foreclosure action, which motion apparently prompted Fernstrom to write to the court in June of the same year.

Because these unpublished pleadings from 2002 were entered prior to the effective date for electronic filing, the actual orders are not readily viewable on the electronic docket.  Moreover, neither party provided me with a copy of the most relevant pleadings.  Consequently, I have scanned and attached to this recommendation a copy of the April 30, 2002, motion to modify, clarify or lift pretrial restraining order; the court's September 26, 2002, amendment to

---

[3]       The Fernstrom letter does not appear on the original criminal docket, but was filed by Ferrell at ECF No. 274-1, Page ID # 754.  I do not know how Ferrell came into possession of this document, although it is stamped as received by the court.  I reiterate that I am unable to find that the letter was ever entered on the docket.

pre-trial restraining order; and the court's October 1, 2003, final order of forfeiture, the three documents I have identified as most likely to have anything to do with Ferrell's claim that the mortgages were somehow extinguished by the forfeiture order.  None of those documents supports a claim that the mortgages have been exempted or extinguished.   Neither Ferrell nor the Hydes filed any pleadings with the court in conjunction with the October 1, 2003, final order of forfeiture.

The docket reflects that on September 26, 2002, the trial judge entered an order amending the pretrial restraining order.  According to Ferrell, he had been assured by the assistant United States Attorney prosecuting Hall that the Hyde property, located at 380 Belfast Road, was "exempted" and that the government "had extinguished ALL of Mr. Hall's right to the 'mortgages'."  (Motion at 2.)  I have carefully reviewed the docket to ascertain if there is any suggestion that the Belfast property was somehow "exempted" from foreclosure by court order. According to the court's actual order amending the restraining order, the only "exemption" to the restraining order allowed Hall to negotiate a $22,464.87 check made out to Fire Island Construction, Inc. for the purpose of paying his legal fees in the criminal case.  Ultimately, as the agent promised, all of Hall's rights in both the construction company and the mortgages were extinguished by the final order of forfeiture entered on October 1, 2003, but there was no exemption of the property from the mortgages.  When the forfeiture order became final, the United States Treasury became the owner of the mortgages to use for whatever purpose it deemed fit in order to attempt to collect on its judgment.  The final order, in other words, did not extinguish the mortgages themselves.

Consistent with this development, Ferrell reports that in the fall of 2003, an asset coordinator for the United States Treasury contacted him and his family regarding the mortgages.

The Hyde family offered the government social security funds held in trust by the government, but the settlement offer was rejected.  Ferrell believed that the government had a five year period to enforce any forfeiture and collection action against the Hydes.  The Hyde family, including Ferrell, continued to live on the property, to maintain it (including replacing the roof), and to pay taxes to the Town of Camden of $80,000.00 over a 10-year period.  They did not hear any more about the "mortgages" until March 2012 when the government filed documents in the Knox County Registry of Deeds indicating that the United States released its interest in the property as a result of the settlement with Hall.

Ferrell is convinced, however, that the resentencing in the criminal case, which resulted in an amended judgment issuing in 2007 (ECF No. 189), somehow should have impacted the status of his family's residence.  Ferrell's theory appears to be related to the fact that count 160 in the indictment, the count involving this particular real estate, alleged criminal activity in 1999, whereas the amended judgment, in the "offense ended" column, says 1998.  The original judgment had left that column blank.  Ferrell does not know if these date discrepancies and the inclusion of his property in the final order of forfeiture was a clerical error or not.  According to Ferrell, it was the court's intention that the mortgages were to be voided.  Ferrell believes that the United States Treasury has acted illegally and bypassed normal forfeiture procedures by settling with Hall and reassigning the mortgages to him without obtaining prior court approval or indeed filing any documents with the court.

Now Hall's lawyer/girlfriend, who originated the fraudulent mortgage scheme and was identified during the criminal trial, has demanded that Ferrell and his family pay the principal amount of the loan plus 12% annual interest in order to avoid foreclosure.  Ferrell finds this particularly outrageous because Hall was granted in forma pauperis status in conjunction with his

various appeals to the First Circuit in the context of his motion to vacate his conviction.[4]

## DISCUSSION

Ferrell asserts three legal arguments in support of his motion for review:  (1) that the amended judgment of 2007, which related solely to length of imprisonment, somehow negated the final order of forfeiture entered in 2003; (2) that the government only had five years in which to enforce any forfeiture; and (3) that the United States District Court, primarily the sentencing judge, should have been consulted to give its approval before the United States Treasury settled with Kevin Hall.  Ferrell also asserts a skeletal equal protection claim, noting that two other individuals who "laundered" money from Kevin Hall were not targeted by the government and have profited from the tainted drug money.  (Reply at 1.)  Ferrell does not cite any legal authority in support of any of these propositions.

The government argues quite persuasively that Ferrell would not have had standing to challenge the original forfeiture order, and thus there is no basis to grant him standing now to obtain a "review" of the final order, let alone an order declaring that the mortgages are invalid and should not have been reassigned to Hall.  (Gov't Response at 4-6, ECF No. 273.)

### Significance of the Amended Judgment

The court's May 24, 2007, post-remand amended judgment specifically incorporated the final order of forfeiture entered on October 1, 2003.  That order was never set aside by the First Circuit Court of Appeals when it remanded the case for the purpose of resentencing and, therefore, there was no error in specifically incorporating it into the amended judgment. Notwithstanding Ferrell's protestations to the contrary, the amended judgment's inclusion of the 1998 end-of-offense date changes nothing.  The offense dates were alleged in the indictment and

---

[4]      That appeal was denied by the appeals court on March 19, 2013.  (ECF No. 271.)  All of the original pleadings in the file have now been returned to this court.

the transaction identified in count 160 always related to events in 1999. The offense end-date that was left blank in the original judgment and listed as 1998 in the amended judgment relates to the time period for the underlying drug conspiracy in count one. The 163 money laundering counts have offense dates ranging from 1997 to 2001 and those dates arise from the indictment itself, not from either the original or amended judgment. For whatever reason, the drug conspiracy dates were not incorporated in the original judgment and the space was left blank. If indeed that happened because of clerical error, as Ferrell asserts, the clerical error has no bearing on the final order of forfeiture.

There is no doubt but that the mortgages in question were forfeited to the United States in 2003 and that the United States Treasury could take whatever action it chose to take regarding those mortgages. Ferrell and the Hydes were on notice of that fact when the Treasury Department representative contacted them in 2003 to negotiate a payment. Ferrell represents that his family offered some funds from a social security trust in payment of the mortgages. The government apparently chose to do nothing with the mortgages for nine years, except attempt to "sell" them to Felicity Hyde who was not interested in buying them.

Ultimately, Ferrell's submissions do not establish his basic contention that the trial judge intended to grant an exemption to the Belfast property or to extinguish these mortgages in the final order of forfeiture. In fact, the court's text order of April 15, 2003, indicates that the intent of the forfeiture order was to make the United States the mortgagee, not to foreclose the mortgages.

> "The forfeiture in this case will not foreclose the mortgages, but simply make the United States the mortgagee. Foreclosure, if it occurs, will come later."

Foreclosure could only happen in the state foreclosure action pending in Knox County. I can find no notation on the docket that would in any way suggest that the trial judge "exempted" or

"extinguished" the Hydes' mortgage obligations and, indeed, his language in the April 15, 2003, text order suggests exactly the opposite.

***The Five-Year Limitation Period***

Ferrell does not cite any legal authority in support of his claim that the government only had five years to collect on the mortgages.  The government says it is unaware of any such five year period and notes that a mortgage can be foreclosed on even if the note it secures is barred by the statute of limitations because Maine follows a title theory of mortgages.  See Johnson v. McNeil, 2002 ME 99, ¶¶ 9-10, 800 A.2d 702, 704 (Me. 2002).  The government is correct. Moreover, even if there were a statute of limitation issue, it would amount to a state law defense to a state law foreclosure action.  This court does not have jurisdiction to issue declaratory judgments in that regard.

Ferrell may have gotten the notion that the government only had five years to collect on its judgment because of a prior order entered in this case, which order related not to the final order of forfeiture but to the criminal monetary penalties imposed by the court.  Ferrell may not be cognizant of the difference between the terms of the criminal judgment and the ancillary final order of forfeiture.  On October 1, 2003, this court entered a final order of forfeiture forfeiting from the defendant, among other things, $511,321.22 in the form of a money judgment and the two mortgages.  Pursuant to the order, the Department of the Treasury was directed to dispose of the forfeited property.  Id.  The October 3, 2003, criminal judgment provided a *separate* order for criminal monetary penalties in the amount of $16,800.00 in special assessments and $27,320.65 in costs of prosecution.  Those penalties were separate and distinct from the October 1, 2003, final order of forfeiture.  As of December 1, 2010, the judgment balance on the criminal judgment itself (not the final order of forfeiture) was $27,145.65.  (See Mem. Dec. and

9

Garnishment Order, ECF No. 234.)

The original judgment total was $44,120.65, which was arrived at by adding the $16,800.00 special assessments[5] and the order for payment of the costs of prosecution in the amount of $27,320.65.  By the time of Hall's release onto supervision, the judgment balance was reduced by applying credit for the small payments made toward the original judgment from Hall's prison earnings and subtracting the $16,800 assessment based upon the expiration of the obligation to pay after five years from the date of judgment, pursuant to 18 U.S.C. § 3013(c). Ferrell may have been confused by this five-year limitation, which has nothing to do with the final order of forfeiture but is mentioned in my memorandum of decision involving the garnishment order.  Other than the five-year expiration regarding special assessments, I have no idea where Ferrell might have gotten the notion that the United States only had five years to collect on the mortgages.  But even if the United States only had five years to collect on the mortgages, the United States is not trying to collect on them at this time in any event.  The United States has released the mortgages back to Kevin Hall and the mortgagor and mortgagee are back to the same point they were at in 2000, before this criminal action ever began.  If the mortgages are no longer valid, or if they never were valid, the Hydes can assert that defense in the foreclosure action.

***Court Approval for the Settlement with Kevin Hall***

Pursuant to the final order of forfeiture, the United States acquired all right, title, and interest in the subject mortgages.  As the trial judge's endorsement order of April 15, 2003, revealed, how the United States proceeded as the mortgagee would be decided at a later time in another forum.  Ferrell suggests that the court has some general oversight obligation in terms of how the Treasury Department disposes of property it has acquired, but he cites no authority for

---

[5]        The $16,800 consists of $100.00 special assessments for 168 of the counts of the indictment.

that proposition and I know of none.  The government had no obligation to return to the court to obtain an order before it disposed of property it obtained as a result of the forfeiture.  The order of forfeiture entered only after every party who claimed any interest in the property had an opportunity to be heard.  The order is termed *final* for that very reason.  The court is certainly not in the business of supervising how the government disposes of the property it owns.

### Ferrell's Standing to Intervene in a Closed Criminal Case

Finally, and perhaps most significantly, I turn to the procedural posture of this motion. Ferrell, as a witness in the 2003 criminal trial, seeks standing to intervene in this criminal case and have the court declare that the mortgages are void.  "[A] party seeking to challenge the government's forfeiture of money or property used in violation of federal law must first demonstrate an interest in the seized item sufficient to satisfy the court of its standing to contest the forfeiture."  United States v. Three Hundred Sixty Four Thousand Nine Hundred Sixty Dollars ($364,960.00) in U.S. Currency, 661 F.2d 319, 326 (5th Cir.1981) (footnote omitted). See also Fed. R. Crim. P. 32.2(c)(1).  Assuming Ferrell had a sufficient interest in the property in 2003, he never asserted that interest then and the time for doing so has long since passed. There simply is no basis for conferring standing upon him to obtain an untimely and unauthorized "review" of the court's forfeiture order.

Assuming that Ferrell's request for "review" should be treated as a motion for relief from judgment pursuant to Fed. R.Civ. P. 60(b), relating to the ancillary final order of forfeiture, see United States v. Minor, 457 Fed. App'x 119, 122 (3rd Cir. 2012) (criminal defendant's nephew and common law wife filed Rule 60(b) motion for relief given unusual circumstances regarding representation by counsel and their claim of an interest in the subject property; court of appeals noted "[t]he judge correctly identified the applicable rule"), there is no basis for Rule 60(b) relief

asserted, even under the catch-all provision.  There is no showing of any prejudice in terms of the passage of time negating any defenses available in a foreclosure proceeding or any other circumstance which would make the final order of forfeiture unjust.  Although it is troubling that Kevin Hall could financially benefit from these transactions after all these years, there is nothing this court can do to interfere with the ongoing foreclosure proceedings in the state court.

## CONCLUSION

Based on the foregoing, I recommend that Ferrell's motion be dismissed because he does not have standing to request a "review" of this court's final order of forfeiture and there is no relief that this court can provide, in any event.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

May 22, 2013                         /s/ Margaret J. Kravchuk
                                     U.S. Magistrate Judge